Filed 1/11/22 (unmodified opinion attached)

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| CHURCH MUTUAL INSURANCE COMPANY, | C088373 |
| Plaintiff and Appellant, | (Super. Ct. No. 181887) |
| v. | ORDER MODIFYING OPINION AND DENYING REHEARING |
| GUIDEONE SPECIALTY MUTUAL INSURANCE COMPANY, | [NO CHANGE IN JUDGMENT] |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Shasta County, Tamara L. Wood, Judge. Affirmed.

Hirsch Closson, Clifford Hirsch, Barrett Braun, and Christopher T. Hicks for Plaintiff and Appellant.

Gordon Rees Scully Mansukhani, Matthew S. Foy, and Matthew G. Kleiner for Defendant and Respondent.

THE COURT:

It is ordered that the opinion filed herein on December 17, 2021, be modified as follows:

On page 11, at the end of the last full sentence ending with "the Church of God, as principal" add as footnote 2 the following footnote, which will require renumbering of all subsequent footnotes:

> **2** Church Mutual asserts in a petition for rehearing that this court may not so conclude without affording the parties an opportunity to address this specific agency issue in supplemental briefing, relying on Government Code section 68081, which provides in relevant part: "Before . . . a court of appeal . . . renders a decision in a proceeding . . . based upon an issue which was not proposed or briefed by any party to the proceeding, the court shall afford the parties an opportunity to present their views on the matter through supplemental briefing. If the court fails to afford that opportunity, a rehearing shall be ordered upon timely petition of any party." We are not persuaded. As we explain more fully below, Church Mutual asks this court to hold the Minutes establish, as a matter of ecclesiastical fact, a unity of identity between Mountain Lakes, California-Nevada, and the greater Church of God. However, the fact that this proposed *holding* is relatively narrow does not mean the *issue* proposed by Church Mutual is equally narrow. Properly understood, the issue raised is what relationship between the various church entities was created by the Minutes? Was it one of unity, as Church Mutual argues, or something else? We conclude it was one of agency. Thus, whether the Minutes established an agency relationship between Mountain Lakes and the greater Church of God is "fairly encompassed" in the main issue raised by Church Mutual in this appeal. (*Dieckmeyer v. Redevelopment Agency of Huntington Beach* (2005) 127 Cal.App.4th 248, 250, fn. 1.) Nor are we persuaded by Church Mutual's additional assertions in its petition for rehearing, specifically, (1) any claim that Mountain Lakes had no insurable interest in the property at the

time of the fire was forfeited by GuideOne's voluntary dismissal of its cross-appeal, which raised that issue, and (2) such dismissal also divested this court of jurisdiction to address the issue in this appeal. Not so. While GuideOne argued in its cross-appeal that the trial court erred in concluding Mountain Lakes had an insurable interest in the property at the time of the fire, and thereafter voluntarily dismissed that cross-appeal, this does not forfeit, or divest this court of jurisdiction to decide, any and all issues properly raised in this appeal. Again, the main issue raised by Church Mutual in this appeal involves the nature of the relationship between the various church entities created by the Minutes. Church Mutual argues unity of identity. We conclude the Minutes instead created an agency relationship. Dismissal of the cross-appeal divested this court of jurisdiction to rule upon that cross-appeal; it did not divest us of jurisdiction to rule upon any and all issues properly before us in the main appeal. The nature of the relationship between the Church of God and its constituent parts is properly before us. We accordingly deny Church Mutual's petition for rehearing.

There is no change in the judgment. Appellant's petition for rehearing is denied.

FOR THE COURT:

 /s/
BLEASE, Acting P. J.


 /s/
HOCH, J.


 /s/
RENNER, J

3

Filed 12/17/21 (unmodified opinion)

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----


| | |
|---|---|
| CHURCH MUTUAL INSURANCE COMPANY, S.I., | C088373 |
| Plaintiff and Appellant, | (Super. Ct. No. 181887) |
| v. | |
| GUIDEONE SPECIALTY MUTUAL INSURANCE COMPANY, | |
| Defendant and Respondent. | |


APPEAL from a judgment of the Superior Court of Shasta County, Tamara L. Wood, Judge. Affirmed.

Hirsch Closson, Clifford Hirsch, Barrett Braun, and Christopher T. Hicks for Plaintiff and Appellant.

Gordon Rees Scully Mansukhani, Matthew S. Foy, and Matthew G. Kleiner for Defendant and Respondent.


1

In this case, a local congregation of the hierarchical Church of God purchased an insurance policy from GuideOne Specialty Mutual Insurance Company (GuideOne) covering the risk of fire damage to a church building that was held by the local congregation, as agent of the greater church, in trust for the benefit of the larger church body. After the local congregation voted to sever its relationship with the Church of God, a regional oversight authority took over as the agent/trustee holding the property on behalf of the greater church, after which the previously affiliated local congregation moved out and the new agent added the property to its own insurance policy, with Church Mutual Insurance Company (Church Mutual), covering the same risk. Fire destroyed the building while both policies were in effect. Church Mutual paid the claim. GuideOne denied coverage on the ground that the former local congregation no longer had an insurable interest in the property. We must determine whether Church Mutual is entitled to contribution from GuideOne. The trial court concluded the answer was no. While we disagree with certain aspects of the trial court's statement of decision, we conclude it reached the correct result. We also conclude the trial court correctly determined Church Mutual was not entitled to prevail against GuideOne on a separate subrogation cause of action. We shall therefore affirm the judgment.

BACKGROUND

***Relevant Historical and Ecclesiastical Facts***

The relevant historical and ecclesiastical facts are relatively straightforward and largely undisputed.

Mountain Lakes House of Prayer (Mountain Lakes) was founded in 1995 as a local congregation of the Church of God, serving congregants in the Shasta Lake area. Later that year, Mountain Lakes bought property in the City of Shasta Lake, including a church building. The grant deeds conveying the property designated the grantee: "California-Nevada Church of God, a California non-profit religious corporation dba

2

Mtn. Lakes House of Prayer." In order to make sense of this designation, we must take a brief detour into the structure of the Church of God.

The Church of God is a hierarchical church with its headquarters located in Cleveland, Tennessee. The highest governing bodies of the church are the International General Assembly, "composed of all members and ministers of the Church of God 16 years of age and above," the International General Council, "composed of all ordained bishops," and the International Executive Council, composed of various church executives. We need not set out their respective duties, except to note that the International General Assembly meets every two years to consider recommendations from the International General Council, which in turn meets every two years to consider recommendations from the International Executive Council. Recommendations that make their way to the International General Assembly are voted upon "for final disposition" and become part of the governing law of the church, published in a book titled "the *Minutes* of the Church of God International General Assembly" (the Minutes).

The Church of God, through another executive body, appoints "state overseers" for the various states or multistate regions in the United States. These state overseers have the power to appoint and remove district overseers and local pastors, as well as to "[a]pprove the selection, purchase, and construction of all church . . . properties, together with the respective district overseers." The office of the state overseer for the California-Nevada region is incorporated under the name: "California-Nevada Church of God" (California-Nevada).

Local congregations are subordinated to both the state overseer and the International General Assembly. Section 46 of the Minutes provides, in relevant part, that the International General Assembly has "full power and authority to designate the teachings, principles, and practices of all the local churches composing said Assembly" and "governs the operation (including ownership of all real and personal property) of the Church of God . . . at all structural levels: international, national, state/territorial, district,

3

and local." This section goes on to provide: "The International General Assembly has vested in the office of the state overseer authority over the local churches." This section further requires "all real estate owned by the local congregation" to "be used, managed, and controlled for the sole and exclusive use and benefit of the Church of God."

More specific property provisions will be set forth later in this opinion. For now, we have said enough to place in context the grantee designation on the 1995 grant deeds: "California-Nevada Church of God, a California non-profit religious corporation dba Mtn. Lakes House of Prayer."

Leonard Jackson was the Mountain Lakes pastor when the property was purchased in September 1995. Prior to execution of the grant deeds, California-Nevada approved the purchase in a resolution signed by the administrative bishop then serving as state overseer, Dan Callahan. Thereafter, Pastor Jackson secured an insurance policy from GuideOne covering, among other things, the risk of fire damage to the property. The insured's name was listed on the application and the policy as: "Mountain Lakes House of Prayer Church of God." The application included a checked box indicating the insured was the owner of the property. Pastor Jackson testified that he mistakenly believed the congregation owned the property at the time. He explained: "I simply was not aware at that time of the policies that the Church of God did this under. I'm not blaming anybody. It was just a misunderstanding, but they owned it from the time that I signed my name on the deed. You are signing for the Church of God as one of their ministers."

The GuideOne policy was renewed by Mountain Lakes each year for the next 18 years. The policy period applicable to this case was September 15, 2013, to September 15, 2014. By this time, Jay Spinks was Mountain Lakes's lead pastor and Charles Fischer was the administrative bishop serving as state overseer for the California-Nevada region.

In April 2014, Mountain Lakes voted to disaffiliate from the Church of God and instead join the Central Valley Assembly of God. Of the 20-member congregation, the

4

vote was 18 votes in favor and 2 votes opposed, with Pastor Jackson and his wife casting the only votes opposing the motion. In late April or early May, Pastor Spinks informed Bishop Fischer of Mountain Lakes's decision to leave the Church of God.

Bishop Fischer testified that after he learned Mountain Lakes was leaving the Church of God, he knew the local congregation could not take the property with them, but he was unsure whether or not the property was insured properly, so he directed the California-Nevada treasurer to add that property to California-Nevada's insurance policy with Church Mutual. A change endorsement effective May 9, 2014, added the property to the Church Mutual policy. This policy also covered, among other things, the risk of fire damage to the property.

On May 23, 2014, a corrective grant deed was executed conveying the property from "CALIFORNIA-NEVADA CHURCH OF GOD, a California Non-Profit Religious Corporation dba Mtn. Lakes House of Prayer" to "CALIFORNIA-NEVADA CHURCH OF GOD, a California Non-Profit Religious Corporation." Thereafter, on June 4, Bishop Fischer submitted an "Inactive Church Form" to the Church of God's international offices in Cleveland, Tennessee, designating Mountain Lakes an inactive congregation effective May 15, 2014.

The church building covered by both policies was destroyed by fire on June 6, 2014. At the time of the fire, the Mountain Lakes congregation had vacated the premises. However, Jackson and his wife continued as members of the Church of God. They helped clean up the property after the fire, hoping the Church of God would rebuild the church building and reestablish a congregation there.

Mountain Lakes and California-Nevada submitted separate claims with their respective insurers, GuideOne and Church Mutual. GuideOne denied coverage on the ground that Mountain Lakes no longer had an insurable interest in the property. Church Mutual paid the claim submitted by California-Nevada and thereafter received an assignment of rights from California-Nevada, under which California-Nevada assigned to

5

Church Mutual "all of its rights and causes of action against [GuideOne] arising out of the fire loss, the handling of the insurance claim, and the unreasonable and wrongful refusal to indemnify [California-Nevada] for the fire loss . . . ."

In January 2017, Pastor Spinks and Bishop Fischer reconciled and Mountain Lakes once again became an active Church of God congregation.  However, because the Church of God never rebuilt the destroyed church building, Mountain Lakes holds services out of a rental property.

### *The Lawsuit*

Church Mutual sued GuideOne, asserting causes of action for declaratory relief, equitable contribution, and subrogation, as well as seeking injunctive relief under a separate cause of action.[1]  After reciting various factual allegations, including the assertion that "[California-Nevada] and its representatives insured the property for damage by fire with [GuideOne]," the declaratory relief causes of action sought judicial declarations of the following:  (1) "[GuideOne] was obligated under its policy to indemnify [California-Nevada] for the fire loss"; (2) "[GuideOne] was obligated under its insurance policy to participate in the cost to indemnify [California-Nevada] for the fire loss by paying for some or all of the costs incurred by [Church Mutual] therefore"; and (3) "[GuideOne] is obligated to reimburse [Church Mutual] for a pro-rata share of the costs incurred to indemnify [California-Nevada] for the fire loss."  Based on the foregoing, Church Mutual sought equitable contribution from GuideOne.  The cause of action for subrogation noted the assignment of rights and sought to pursue any and all

---

[1]     As we have previously explained, "[i]njunctive relief is a remedy, not a cause of action."  (*City of South Pasadena v. Department of Transportation* (1994) 29 Cal.App.4th 1280, 1293.)  In any event, this purported cause of action is not relevant to the claims raised in this appeal.  We mention it no further.

causes of California-Nevada could have brought against GuideOne, including a claim for attorney fees under *Brandt v. Superior Court* (1985) 37 Cal.3d 813.

### *Arguments Raised During Trial*

This action was tried by the trial court without a jury. The essential facts adduced during the trial are those recounted above. In order to place in context the trial court's statement of decision, we provide a fairly detailed summary of the arguments made by the parties in their extensive trial briefing.

Church Mutual argued in its opening trial brief that "all the Church of God entities" involved in the purchase, ownership, and use of the covered church property, i.e., Mountain Lakes as the "local congregation," California-Nevada as the "regional jurisdictional entity," and the Church of God as the greater entity on behalf of which the property was held, "had legally recognizable insurable interests in the property" under the GuideOne policy. Church Mutual argued the structure and governing documents of the Church of God established as an ecclesiastical fact that these otherwise distinct entities were in reality "all part of one religious entity" such that both California-Nevada and the Church of God were insureds under the GuideOne policy.

In the alternative, Church Mutual argued "it is not necessary that [California-Nevada] and [Mountain Lakes] be one and the same entity for purposes of proration between two insurers on the same risk at the same time." Instead, relying on *Burns v. California FAIR Plan Assn.* (2007) 152 Cal.App.4th 646 (*Burns*), Church Mutual asserted "pro rata sharing of a loss between insurance companies does not require the same insureds, only the same risk i.e. the same property." Church Mutual further argued the GuideOne application, 1995 grant deeds, and GuideOne's underwriting file confirmed the mutual intent of GuideOne and Mountain Lakes was for the GuideOne policy to cover both the ownership interest of the Church of God and the occupancy interest of the local Mountain Lakes congregation. Finally, Church Mutual argued GuideOne's denial of the

7

claim was unreasonable, amounted to a breach of the implied covenant of good faith and fair dealing, and entitled Church Mutual to *Brandt* fees.

GuideOne argued in its opening trial brief that Church Mutual could not prevail on its equitable contribution cause of action because the two insurers did not share " 'the *same* level of obligation on the *same* risk as to the *same* insured,' " quoting *Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279 (*Fireman's Fund*) in support of this requirement. Instead, GuideOne argued, "Church Mutual insured [California-Nevada's] interest in the Property and GuideOne insured Mountain Lakes' interest in the Property, an interest which terminated prior to the fire loss." GuideOne noted the declarations pages of the respective policies indicated they "insured separate entities" and argued such a reading of the policies was consistent with the stated understanding of both Pastor Spinks and GuideOne's underwriter, Brenda Engleman, both of whom believed the GuideOne policy covered only Mountain Lakes as the local congregation.

In response to Church Mutual's argument that Mountain Lakes and California-Nevada "were one in the same," GuideOne countered that Mountain Lakes was an unincorporated association, and therefore a "distinct legal entit[y]" from California-Nevada, a nonprofit religious corporation. GuideOne noted Bishop Fischer submitted a declaration in support of a summary adjudication motion referring to Mountain Lakes as an unincorporated religious association that was affiliated with California-Nevada, nowhere suggesting these two entities were in fact one singular entity. GuideOne also argued that reliance on " 'church law' " to establish the singular nature of these Church of God entities would violate constitutional limitations articulated by the United States Supreme Court with respect to deciding secular disputes.

Acknowledging that California-Nevada had an insurable ownership interest in the property, GuideOne argued this was "irrelevant because [California-Nevada] was insured under the Church Mutual Policy, not the GuideOne policy." In other words, "the fact that

8

[California-Nevada] had an insurable interest in the Property does not mean that it is entitled to coverage under the GuideOne Policy, which was issued to Mountain Lakes." Mountain Lakes was GuideOne's named insured and that entity "did not have an insurable interest in the Property at the time of the fire loss" because Mountain Lakes voted to disaffiliate from the Church of God and vacated the premises.

With respect to Church Mutual's subrogation cause of action, GuideOne noted that Church Mutual, " 'stand[ing] in the shoes' " of California-Nevada, could only assert "any claims [California-Nevada] has against GuideOne." However, GuideOne argued, California-Nevada had no viable claims to pursue because it was not an insured under the GuideOne policy and, in any event, California-Nevada suffered no damages because it was fully indemnified by Church Mutual. GuideOne further argued that Church Mutual, as the entity that covered the fire loss, was not entitled to seek recovery from GuideOne under a subrogation theory because GuideOne did not cause the fire loss. Finally, GuideOne argued a subrogation claim lies only where the insurer that paid the loss was not primarily liable and the nonparticipating insurer was primarily liable, but here, Church Mutual was primarily liable for the fire loss to the church property owned by its insured, California-Nevada.

Closing and responsive briefs were submitted following the presentation of evidence. The arguments presented by the parties did not materially change. We do note, however, that Church Mutual disputed GuideOne's conclusion that Mountain Lakes either vacated the property or ceased to exist as a Church of God congregation prior to the fire loss. In response, GuideOne explained "that is precisely what [the company] was told during its claims investigation," by both Pastor Spinks and Bishop Fischer.

### *Statement of Decision*

The trial court determined Mountain Lakes, California-Nevada, and the greater Church of God were separate legal entities. The GuideOne policy covered Mountain Lakes, as the local congregation, not California-Nevada or the Church of God. The trial

9

court concluded GuideOne erroneously determined Mountain Lakes had no insurable interest in the property at the time of the fire, noting Mountain Lakes was responsible for mortgage payments on the property for the 19 years that it paid the GuideOne policy premiums and further noting that Mountain Lakes and the greater Church of God were in the midst of a dispute over ownership of the property at the time of the fire.

The trial court further stated that it need not determine the respective ownership interests of Mountain Lakes and the Church of God in the destroyed church building because Mountain Lakes had rejoined the Church of God and the parties no longer disputed their respective interests. The trial court instead noted GuideOne was aware that Mountain Lakes never held title to the property and was "rather . . . an owner who purchased the property, paid the mortgages, insured the property for nineteen years and had the right to occupy the property," facts the court determined "remained unchanged at the time of the fire loss" because Mountain Lakes continued to exist as a congregation of two, i.e., Pastor Jackson and his wife, who voted to remain in the Church of God, and "performed clean up after the fire intending that the [Church of God] would rebuild the property for [Mountain Lakes]." The trial court also noted that Pastor Spinks continued to hold meetings as Mountain Lakes until July 2014, after the fire. With respect to the right to occupy the property, the trial court stated that it agreed with Church Mutual's expert that Mountain Lakes had such a right of occupancy, and supported that conclusion by noting Pastor Jackson testified that he continued to be a pastor of the Church of God even after a majority of the Mountain Lakes congregation voted to disaffiliate. The trial court also relied on the fact that, over two years after disaffiliating, Mountain Lakes once again became an active congregation in the Church of God. Based on the foregoing, the trial court concluded Mountain Lakes had an insurable interest in the property at the time of the fire and GuideOne erred in determining otherwise.

Nevertheless, distinguishing *Burns*, *supra*, 152 Cal.App.4th 646, the trial court concluded that although GuideOne should have paid Mountain Lakes on a pro rata basis

10

for the fire loss, Church Mutual could not succeed on its equitable contribution claim against GuideOne because "the two parties insured two different entities with two different insurable interests in the property" and "[Church Mutual] did not have an assignment from [Mountain Lakes] but rather the separate legal entity of California-Nevada . . . ." With respect to Church Mutual's subrogation claim, the trial court concluded this claim failed because Church Mutual could only pursue viable claims held by its insured, California-Nevada, and as the court already concluded, California-Nevada was not an insured under the GuideOne policy. Finally, the trial court concluded its ruling on the subrogation claim rendered moot the question of Church Mutual's asserted entitlement to *Brandt* fees.

This appeal followed.

## DISCUSSION

Church Mutual contends: (1) the trial court erroneously concluded Mountain Lakes, California-Nevada, and Church of God are separate legal entities such that California-Nevada (or Church of God) is not an insured under the GuideOne policy and therefore not entitled to recovery under the policy; (2) the trial court also erroneously analyzed Church Mutual's claims for equitable contribution and subrogation under third party principles rather than first party principles; (3) equity requires GuideOne to pay for the entire loss; and (4) the trial court further abused its discretion by imposing evidentiary sanctions precluding Church Mutual from submitting attorney invoices for purposes of establishing its entitlement to *Brandt* fees.

We conclude the trial court correctly determined Mountain Lakes, California-Nevada, and the greater Church of God are separate legal entities. As we explain, the Minutes of the Church of God's International General Assembly do not establish the unity of these entities in any legally cognizable way. What the Minutes do establish as ecclesiastical fact is an agency relationship between Mountain Lakes, as agent, and the Church of God, as principal. The church property at issue in this case was purchased by

11

Mountain Lakes on behalf of the Church of God and was held in trust for the greater church body. Mountain Lakes also insured the property as an agent of the Church of God. However, as a matter of law, that agency relationship ended before the fire loss when Bishop Fischer, the head of California-Nevada, made Mountain Lakes an inactive congregation and executed a corrective grant deed making clear that it was no longer "doing business as" Mountain Lakes. Thus, by the time of the fire, California-Nevada stepped in as the agent of the Church of God holding title to the property on behalf of the greater church, and separately insuring the property in this capacity. We must therefore determine what happens when two insurance policies cover the same risk of loss on the same property, both taken out by the lawful agent of the same principal on behalf of whom the property was held, but where the first agent's relationship with the principal was terminated prior to the loss but before that policy term expired. There is no dispute the current agent's insurer, Church Mutual, is on the hook for the loss. But is the former agent's insurer, GuideOne, obligated to contribute? We conclude the answer is no.[2]

We also conclude Church Mutual was not entitled to prevail against GuideOne on a subrogation theory because, under such a theory, Church Mutual was entitled to pursue only those causes of action California-Nevada could pursue against GuideOne. However, California-Nevada was not GuideOne's insured and possessed no viable causes of action against that insurer.[3]

---

[2]    This conclusion renders it unnecessary to address Church Mutual's third argument asking this court to shift the entire loss to GuideOne.

[3]    This conclusion makes it unnecessary to address Church Mutual's fourth argument concerning *Brandt* fees.

# I

### *Mountain Lakes, California-Nevada, and Church of God are Separate Legal Entities*

We first reject Church Mutual's assertion that the trial court erroneously concluded Mountain Lakes, California-Nevada, and Church of God are separate legal entities. According to Church Mutual, the Minutes establish as a matter of ecclesiastical fact, "binding on both GuideOne and the courts of California," that Mountain Lakes, California-Nevada, and Church of God are "a singular religious entity" such that California-Nevada is an insured under the GuideOne policy and therefore entitled to recovery under the policy. We disagree.

More than a century ago, in *Watson v. Jones* (1872) 80 U.S. 679 [20 L.Ed. 666], the United States Supreme Court explained: "Religious organizations come before us in the same attitude as other voluntary associations for benevolent or charitable purposes, and their rights of property, *or of contract*, are equally under the protection of the law, and the actions of their members subject to its restraints." (*Id*. at p. 714, italics added.) That has not changed. In the high court's "most recent decision involving a church property dispute, the court stated, 'There can be little doubt about the general authority of civil courts to resolve this question. The State has an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of church property can be determined conclusively.' " (*Episcopal Church Cases* (2009) 4 Cal.4th 467, 478, quoting *Jones v. Wolf* (1979) 443 U.S. 595, 602 [61 L.Ed.2d 775].) The same can be said of a state's interest in resolving an insurance dispute involving church property.

In the context of resolving church property disputes, "the United States Supreme Court has made two points clear: (1) how state courts resolve [such] disputes is a matter of state law; but (2) the method a state chooses must not violate the First Amendment to the United States Constitution." (*Episcopal Church Cases*, *supra*, 45 Cal.4th at pp. 478-479, fn. omitted.) Elaborating on these points, our Supreme Court again quoted from

*Jones v. Wolf*, *supra*, 443 U.S. at page 602: " '[T]he First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice. [Citations.] As a corollary to this commandment, the Amendment requires that civil courts defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchical church organization. [Citations.] Subject to these limitations, however, the First Amendment does not dictate that a State must follow a particular method of resolving church property disputes. Indeed, "a State may adopt *any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith." ' [Citation.]" (*Episcopal Church Cases*, at p. 479.)

California has adopted a " ' "neutral principles of law" ' approach" for resolving church property disputes. (*Episcopal Church Cases*, *supra*, 45 Cal.4th at pp. 480, 485.) As our Supreme Court has directed: "Subject to the proviso that secular courts may not decide questions of church doctrine, we believe that California courts should use neutral principles of law to decide church property disputes. [¶] Accordingly, we conclude that secular courts called on to resolve church property disputes should proceed as follows: State courts must not decide questions of religious doctrine; those are for the church to resolve. Accordingly, if resolution of a property dispute involves a point of doctrine, the court must defer to the position of the highest ecclesiastical authority that has decided the point. But to the extent the court can resolve a property dispute without reference to church doctrine, it should apply neutral principles of law. The court should consider sources such as the deeds to the property in dispute, the local church's articles of incorporation, the general church's constitution, canons, and rules, and relevant statutes, including statutes specifically concerning religious property, such as Corporations Code section 9142." (*Id.* at p. 485.)

Applying the neutral principles approach to the church property dispute at issue in *Episcopal Church Cases*, between the hierarchical Episcopal Church and its Los Angeles

14

Diocese on one side of the dispute and a local parish that disaffiliated itself from the Episcopal Church on the other side, the court explained that although the record title to the church property in question was held by the local parish, that parish "promised to be bound by the constitution and canons of the Episcopal Church" and a certain canon enacted prior to the dispute "provide[d] that property held by a local parish 'is held in trust' for the general church and the diocese in which the local church is located." (*Episcopal Church Cases*, *supra*, 45 Cal.4th at pp. 485-486.)  The court held the trust provision prevailed.  Quoting once again from *Jones v. Wolf*, *supra*, 443 U.S. at page 606:  " '*At any time before the dispute erupts*, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property.  They can modify the deeds or the corporate charter to include a right of reversion or trust in favor of the general church.  *Alternatively, the constitution of the general church can be made to recite an express trust in favor of the denominational church*.  The burden involved in taking such steps will be minimal.  *And the civil courts will be bound to give effect to the result indicated by the parties*, provided it is embodied in some legally cognizable form.' "  (*Episcopal Church Cases*, at p. 487.)  The court further explained this conclusion was consistent with Corporations Code section 9142, providing that the assets of a religious corporation may be impressed with a trust where " '*the governing instruments of a superior religious body or general church of which the corporation is a member, so expressly provide*.' "  (*Episcopal Church Cases*, at p. 488, quoting Corp. Code, § 9142, subd. (c).)

Underlying the insurance dispute in this case is a church property dispute that is similar to the one presented in *Episcopal Church Cases*.  While we need not resolve that dispute in this opinion, we note the parties appear to be in agreement that the church property at issue in this case was held by Mountain Lakes in trust for the Church of God.  What is crucially at issue in this insurance case is the relationship between Mountain Lakes, California-Nevada, and the Church of God, both when Mountain Lakes secured

15

insurance coverage from GuideOne and at the time of the fire. Although this is an insurance dispute rather than a church property dispute, the same limitations imposed by the First Amendment to the United States Constitution apply equally here. We "cannot interfere in disputes relating to religious doctrine, practice, faith, ecclesiastical rule, discipline, custom, law, or polity" (*New v. Kroeger* (2008) 167 Cal.App.4th 800, 815), the latter term " 'refer[ring] to the general governmental structure of a church, the organs of authority and the allocation and locus of its judicatory powers as defined by its own organic law.' [Citations.]" (*Barr v. United Methodist Church* (1979) 90 Cal.App.3d 259, 267, fn. 6 (*Barr*).) What we can, and must, do is apply neutral principles of law to this determination without interfering in the internal structure and governance of the Church of God.

The Church of God and California-Nevada are separately incorporated as not-for-profit religious organizations. Local congregations within the Church of God may also incorporate, but are not required to do so. The Minutes (in section 1, part III, subpart D) provide: "It is understood that the laws of some states may prefer incorporation of local churches, while the laws of other states may not. Forms for articles of incorporation, charters, and bylaws of incorporations of local Churches of God shall be prepared, and all of such documents shall be approved by the International Executive Committee in consultation with the Church of God legal counsel, in accordance with all aspects of Church of God polity." Mountain Lakes did not so incorporate. However, we agree with the trial court's conclusion that it operated as an unincorporated religious association.

"Groups which have been included as unincorporated associations in addition to labor unions [citations] and political parties are social clubs, religious organizations, environmental societies, athletic organizations, condominium owners, lodges, stock exchanges and veterans. The criteria applied to determine whether an entity is an unincorporated association are no more complicated than (1) a group whose members share a common purpose, and (2) who function under a common name under

16

circumstances where fairness requires the group be recognized as a legal entity. Fairness includes those situations where persons dealing with the association contend their legal rights have been violated. [Citation.] Formalities of quasi-corporate organization are not required. [Citations.] Courts have even assessed liability against a church association with no officers where there were only nine persons whose sole business transaction (aside from small purchases of printed religious material) was the purchase, by down payment, of a station wagon." (*Barr*, *supra*, 90 Cal.App.3d at pp. 266-267, citing *Steuer v. Phelps* (1974) 41 Cal.App.3d 468.)

There can be no doubt that the members of the Mountain Lakes congregation both shared a common purpose and functioned under a common name under circumstances where fairness requires the group be recognized as a legal entity. Mountain Lakes not only purchased the church property at issue in this case, but also insured that property with GuideOne, making premium payments for 18 years. While, as we shall explain, it did so as an agent of the Church of God, this does not negate the fact that Mountain Lakes is a separate legal entity from both California-Nevada and the greater Church of God.

Nevertheless, Church Mutual argues the "singular indivisible entity of the Church of God" is established by the following provisions in the Minutes:

Section 48, part III, titled "**LOCAL CHURCH PART OF THE ASSEMBLY**," provides in relevant part: "The local churches, the names of which are officially registered with the Church of God, Cleveland, Tennessee, U.S.A., are the result of the faithful services of the ministers and representatives of the International General Assembly; and these churches, when thus received by the representatives of the International General Assembly, then became and composed a part of the International General Assembly. Therefore, the right of any local church as a whole to withdraw from the International General Assembly is not recognized and does not exist, but those members who prove disloyal to the government and teachings as promulgated from time

17

to time by the International General Assembly, or who are otherwise disorderly, are to be dealt with as individuals."

Section 55, titled "**CHURCH PROPERTY**," provides in relevant part:

"**I.     CENTRALIZED FORM OF GOVERNMENT**

"The Church of God (Cleveland, Tennessee, U.S.A.) has a centralized (by legal definition 'hierarchical') form of church government.  The International General Assembly, the highest authority of the Church of God, governs the ownership of all church property, both real and personal.  All property is held in trust for members composing said International General Assembly.

"**II.     AUTHORITY OF THE INTERNATIONAL GENERAL ASSEMBLY**

"The International General Assembly of the Church of God (Cleveland, Tennessee, U.S.A.) is that organized body with full power and authority to designate the teaching, government, principles and practices of all the local churches composing said Assembly.

"1.     The International General Assembly governs the operation (including ownership of all real and personal property) of the Church of God (Cleveland, Tennessee, U.S.A.) at all structural levels:  international, national, state/territorial, district, and local.

"2.     [nearly verbatim repetition of section 48, part III, quoted above.]

"**III.  POLITY AND PROPERTY**

"Believing a centralized form of government to be the Biblical (Acts 15:13-29) standard for our churches, the Church of God (Cleveland, Tennessee, U.S.A.) early adopted such a form of government and has consistently practiced a centralized form of government.

"Therefore:

"1.     The polity of the Church of God (Cleveland, Tennessee, U.S.A.) regarding both real and personal property ownership directly reflects the religious conviction that a

18

centralized (by legal definition 'hierarchical') form of government is Biblically mandated.

"2.     Title to all real and personal property now owned or hereafter acquired by the Church of God (Cleveland, Tennessee, U.S.A.) at any structural level shall be held by and/or conveyed and transferred to its duly elected or appointed trustees and their successors in office in trust for the use and benefit of the Church of God (Cleveland, Tennessee, U.S.A.).  Every instrument of conveyance of real estate shall contain the appropriate trust clauses under the caption 'Deeds' as set forth in Section V below.  [¶] . . . [¶]

"**IV.     ALL PROPERTY OWNED IN TRUST FOR CHURCH OF GOD (CLEVELAND, TENNESSEE)**

"Title to all properties held at general or state/territorial level, or by a local church, shall be held in trust for the Church of God (Cleveland, Tennessee, U.S.A.) subject to the provisions outlined in the International General Assembly *Minutes*.  Should any member or members, in whole or in part, decide to withdraw from the Church of God (Cleveland, Tennessee, U.S.A.), or to take action contrary to the polity of the Church of God (Cleveland, Tennessee, U.S.A.), it is understood that the ownership of all property, both real and personal, remains with the Church of God (Cleveland, Tennessee, U.S.A.)."

Contrary to Church Mutual's position, the foregoing provisions in the Minutes do not establish the Church of God, California-Nevada, and Mountain Lakes are a singular legal entity, as least not in any "legally cognizable" way.  (*Jones v. Wolf*, *supra*, 443 U.S. at p. 606.)  What they, and other provisions, establish instead is that the Church of God is a hierarchical church with a central governing body, the International General Assembly, exercising control over all matters of church doctrine, governance, practice, discipline, and property ownership at all structural levels of the church, including the state/regional level (e.g., California-Nevada) and the local level (e.g., Mountain Lakes).  While the International General Assembly is "composed of all members and ministers of the

19

Church of God 16 years of age and above," and therefore, members and ministers of local congregations are also members of the International General Assembly when it convenes every two years, this does not mean that there is a legal unity between the local congregations, the state/regional overseers, and the greater church.

Rather than legal unity, the Minutes establish an agency relationship between these separate legal entities. Agency exists when a principal engages an agent to act on the principal's behalf and subject to its control. (*van't Rood v. County of Santa Clara* (2003) 113 Cal.App.4th 549, 571.) The essential elements necessary to establish an agency relationship are (1) " ' "manifestation of consent by one person to another that the other shall act on his [or her] behalf and subject to his [or her] control, and consent by the other so to act." ' " (*Ibid*.; see also *Michelson v. Hamada* (1994) 29 Cal.App.4th 1566, 1579.) Although the existence of an agency relationship is typically a question of fact, where the essential facts are not in dispute, the existence of agency becomes a matter of law. (*van't Rood*, at p. 562; *Violette v. Shoup* (1993) 16 Cal.App.4th 611, 619; *Magnecomp Corp. v. Athene Co., Ltd.* (1989) 209 Cal.App.3d 526, 536.)

Here, the Minutes establish that the legal entities operating at the various structural levels of the Church of God are to act on the latter's behalf and subject to its control. Consent by Mountain Lakes so to act is undisputed. Indeed, Church Mutual relies on Pastor Jackson's testimony that Mountain Lakes was bound by the Minutes and that he purchased the church property at issue in this case on behalf of the Church of God. The testimony of Bishop Fischer and Church of God general counsel, Dennis Watkins, was in accord. Although we disagree with Church Mutual's legal position that this makes Mountain Lakes, California-Nevada, and the Church of God a single legal entity, it does

make Mountain Lakes an agent of the Church of God when the property was purchased and when the GuideOne policy was executed.[4]

Finally, we note this conclusion is consistent with *Barr*, *supra*, 90 Cal.App.3d 259, in which our colleagues at the Fourth Appellate District held the similarly structured hierarchical United Methodist Church (UMC) operated as an unincorporated religious association exercising control over the local churches' selection of pastors as well as restricting the purchase or sale of church property. (*Id*. at p. 269.) After providing an example of the UMC granting authority to its finance committee to act on its behalf and subject to its control, the court concluded "this grant and description of authority to an agent" reasonably inferred "the existence of UMC as principal." (*Ibid*.)

Similarly, here, the Church of God "is a highly organized religious body working through specific agencies" to accomplish various goals. (*Barr*, *supra*, 90 Cal.App.3d at p. 270.) Mountain Lakes was given authority to act on the Church of God's behalf in purchasing the church property at issue in this case, subject to the requirement that California-Nevada approve the purchase, which it did. In turn, California-Nevada acted on behalf of the Church of God in approving the purchase and designating itself the owner of the property on the deeds, "doing business as" Mountain Lakes. However, beneficial ownership of the property at all times resided in the Church of God, as the

---

[4]     Church Mutual also relies on portions of the deposition testimony of Pastor Spinks, submitted as evidence by stipulation, in which Pastor Spinks testified that Mountain Lakes was "part of" the Church of God, rather than "a separate entity like a lot of organizations are, a lot of churches are." He also went so far as to refer to Mountain Lakes, California-Nevada, and the Church of God as "the same thing." We do not, and cannot, offer an opinion with respect to whether this view of the Church of God is accurate as a theological matter. We simply note the Minutes do not establish this to be the case in any legally cognizable way. Indeed, as previously mentioned, the Church of God and California-Nevada are separately incorporated, and the Minutes recognize that local churches may also be incorporated. One pastor's view that these separate legal entities are actually a single entity is not binding on either the trial court or this court.

21

principal on whose behalf the property was held. Likewise, after a majority of the Mountain Lakes congregation voted to disaffiliate from the Church of God, California-Nevada acted on behalf of the greater church in designating Mountain Lakes an inactive congregation and executing a corrective grant deed indicating it was no longer holding title under the name Mountain Lakes. At this point in time, prior to the fire, Mountain Lakes was no longer an agent of the Church of God. (See Civ. Code, § 2356, subd. (a)(1) [agency relationship may be terminated by "revocation by the principal"]; *Pacific Landmark Hotel, Ltd. v. Marriott Hotels, Inc.* (1993) 19 Cal.App.4th 615, 626-627 [termination of agency determined as a matter of law].)

We discuss immediately below how these determinations affect Church Mutual's contribution and subrogation claims. For now we simply conclude the trial court correctly determined Mountain Lakes, California-Nevada, and Church of God are separate legal entities.

## II

### *Church Mutual's Contribution Claim Fails*

Church Mutual argues the trial court, after correctly concluding Mountain Lakes had an insurable interest in the church property at the time of the fire and that GuideOne therefore should not have rejected Mountain Lakes's claim on that basis, erred in nevertheless concluding Church Mutual was not entitled to equitable contribution from GuideOne. We conclude the trial court erred in determining Mountain Lakes had an insurable interest in the property at the time of the fire. It did not. For that reason, Church Mutual was not entitled to equitable contribution from GuideOne. "Generally, 'we will affirm a judgment or order if it is correct on any theory of law applicable to the case, even if it is right for the wrong reasons.' [Citation.]" (*Cape Concord Homeowners Assn. v. City of Escondido* (2017) 7 Cal.App.5th 180, 193.)

"Equitable contribution is 'the right to recover . . . from a co-obligor who shares . . . liability with the party seeking contribution. In the insurance context, the right to

contribution arises when several insurers are obligated to indemnify or defend the same loss or claim, and one insurer has paid more than its share of the loss or defended the action without any participation by the others. Where multiple insurance carriers insure the same insured and cover the same risk, each insurer has independent standing to assert a cause of action against its coinsurers for equitable contribution when it has undertaken the defense or indemnification of the common insured. Equitable contribution permits reimbursement to the insurer that paid on the loss for the excess it paid over its proportionate share of the obligation, on the theory that the debt it paid was equally and concurrently owed by the other insurers and should be shared by them pro rata in proportion to their respective coverage of the risk. The purpose of this rule of equity is to accomplish substantial justice by equalizing the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense of others.' [Citation.]" (*Jones v. Golden Eagle Ins. Corp.* (2011) 201 Cal.App.4th 139, 149, italics omitted; see also *American Continental Ins. Co. v. American Casualty Co.* (2001) 86 Cal.App.4th 929, 937.)

The trial court concluded Church Mutual was not entitled to contribution from GuideOne because the two insurers did not insure the same insured, but rather, "the two parties insured two different entities with two different insurable interests in the property." Church Mutual relies on *Burns*, *supra*, 152 Cal.App.4th 646, for the proposition that Insurance Code sections 2070 and 2071[5] "allow pro rata payment of claims even where . . . there are different insureds." (*Burns,* at p. 658.) There, however,

---

[5] Insurance Code section 2070 requires "[a]ll fire policies on subject matter in California shall be on the standard form . . . ." Insurance Code section 2071 sets forth the following standard form policy language for pro rata liability: "This company shall not be liable for a greater proportion of any loss than the amount hereby insured shall bear to the whole insurance covering the property against the peril involved, whether collectible or not."

the two insureds each had an insurable interest in the property at the time of the fire. Burns held a life estate in the property and a trust held the remainder interest in the property. (*Id.* at p. 650.) Burns and the trust had separate insurance policies insuring their separate interests. After their insurers made payment on a pro rata basis, both insureds sued, "each [seeking] full recovery on their respective insurance policies, rather than the pro rata payout by the insurers." (*Ibid.*) The trial court granted summary judgment for the insurers and the Court of Appeal affirmed explaining: "While it cannot be denied that Burns and the Trust had separately insurable interests, it does not follow that both could recover the maximum allowed under their respective insurance policies without regard to the value of the destroyed property." (*Id.* at p. 653.) Stated differently, were each allowed to recover the maximum allowed under their policies, "their combined recovery would approximately double the actual damage caused by the fire" and "[o]ur Supreme Court long ago recognized that the nature of insurance does not provide for recovery in excess of the value of the property destroyed where there is but one loss." (*Ibid.*)

Here, unlike *Burns*, the two insureds, Mountain Lakes and California-Nevada, did not each have an insurable interest in the church property at the time of the fire. " 'Every interest in property, or any relation thereto, or liability in respect thereof, of such a nature that a contemplated peril might directly damnify the insured, is an insurable interest.' [Citation.] 'In common parlance, we speak of a house as being insured, but, strictly speaking, it is not the house but the interest of the owner therein that is insured, and, whether that interest is founded upon a legal title, an equitable title, a lien, or such other lawful interest therein as will produce a direct and certain pecuniary loss to the insurer by its destruction, he has an insurable interest therein.' [Citation.]" (*Burns*, *supra*, 152 Cal.App.4th at p. 651.)

At the time of the fire in this case, only California-Nevada and the Church of God had such an interest in the property, California-Nevada as the agent holding title to the

property on the Church of God's behalf, and the Church of God as the principal on whose behalf the property was held. Mountain Lakes previously held the property as the Church of God's agent, but had no interest in the property separate and apart from its right to possess, occupy, and manage the property as an agent of the Church of God. Once that agency relationship terminated, so did its interest in the property. (Rest.2d Agency, § 382, com. d, p. 186 [terminated agent under a duty to return to the principal anything received on the principal's behalf]; see also *Savage v. Mayer* (1949) 33 Cal.2d 548, 551.) As we have already explained, Mountain Lakes's agency relationship ended when a majority of the Mountain Lakes congregation voted to disaffiliate from the Church of God and California-Nevada, acting on the Church of God's behalf, designated Mountain Lakes an inactive congregation and executed the corrective grant deed. Thus, prior to the fire, Mountain Lakes was no longer an agent of the Church of God and possessed no insurable interest in the Church of God's property.

"Every California case of which we are aware has enforced an insurer's contribution claim only where the other insurer was also obligated to pay on the claim. [Citations.] On the other hand, where there is no common obligation that is legally due from multiple insurers, then no basis for contribution exists. [Citations.]" (*American Continental Ins. Co. v. American Casualty Co.*, *supra*, 86 Cal.App.4th at pp. 937-938.) Because, on these facts, GuideOne had no obligation to pay on the claim, Church Mutual was not entitled to contribution.

## III

### *Church Mutual's Subrogation Claim Fails*

Church Mutual's subrogation claim fares no better.

In *Fireman's Fund*, *supra*, 65 Cal.App.4th 1279, our colleagues at the First Appellate District set out the applicable law in cogent fashion:

"Subrogation is defined as the substitution of another person in place of the creditor or claimant to whose rights he or she succeeds in relation to the debt or claim.

25

By undertaking to indemnify or pay the principal debtor's obligation to the creditor or claimant, the 'subrogee' is equitably *subrogated* to the claimant (or 'subrogor'), and succeeds to the subrogor's rights against the obligor. [Citation.] In the case of insurance, subrogation takes the form of an insurer's right to be put in the position of the insured in order to pursue recovery from third parties legally responsible to the insured for a loss which the insurer has both insured and paid. [Citations.] ' "As now applied [the doctrine of equitable subrogation] is broad enough to include every instance in which one person, not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter." [Citations.]' [Citation.]

"The essential elements of an insurer's cause of action for equitable subrogation are as follows: (a) the insured suffered a loss for which the defendant is liable, either as the wrongdoer whose act or omission caused the loss or because the defendant is legally responsible to the insured for the loss caused by the wrongdoer; (b) the claimed loss was one for which the insurer was *not* primarily liable; (c) the insurer has compensated the insured in whole or in part for the same loss for which the defendant is primarily liable; (d) the insurer has paid the claim of its insured to protect its own interest and not as a volunteer; (e) the insured has an existing, assignable cause of action against the defendant which the insured could have asserted for its own benefit had it not been compensated for its loss by the insurer; (f) the insurer has suffered damages caused by the act or omission upon which the liability of the defendant depends; (g) justice requires that the loss be entirely shifted from the insurer to the defendant, whose equitable position is inferior to that of the insurer; and (h) the insurer's damages are in a liquidated sum, generally the amount paid to the insured. [Citations.]

"The right of subrogation is purely derivative. An insurer entitled to subrogation is in the same position as an assignee of the insured's claim, and succeeds only to the rights of the insured. The subrogated insurer is said to ' "stand in the shoes" ' of its

26

insured, because it has no greater rights than the insured and is subject to the same defenses assertable against the insured. Thus, an insurer cannot acquire by subrogation anything to which the insured has no rights, and may claim no rights which the insured does not have. [Citations.]" (*Fireman's Fund*, *supra*, 65 Cal.App.4th at pp. 1291-1293.)

Here, Church Mutual stands in the shoes of its insured, California-Nevada. While California-Nevada suffered a loss in the fire, GuideOne was not obligated to indemnify California-Nevada for that loss because the GuideOne policy did not cover California-Nevada's interest in the property. That interest was covered by the Church Mutual policy and California-Nevada was fully indemnified by Church Mutual. For these reasons, we agree with the trial court that California-Nevada has no viable causes of action to pursue against GuideOne.

## DISPOSITION

The judgment is affirmed. GuideOne is entitled to costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)


　　　　　　　　　　　　　　　　　　/s/ 　　　　　　　　　　　　
　　　　　　　　　　　　　　　　　　HOCH, J.


We concur:


 /s/ 　　　　　　　　　　　　
BLEASE, Acting P. J.


 /s/ 　　　　　　　　　　　　
RENNER, J.


27